UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                     :

WILSON GALARZA,                   :

                                   :

                 Plaintiff,       :

                                   :

         -against-         :

                                   :

THE CITY OF NEW YORK; POLICE OFFICER  :

CARLOS AQUINO, individually and in his  :         **AMENDED COMPLAINT**

official capacity; POLICE OFFICER CARLOS  :

AVILES, individually and in his official capacity;  :     No. 19 Civ. 10898 (LAK) (KHP)

POLICE OFFICER HECTOR CAMACHO,  :

individually and in his official capacity; POLICE  :     **Jury Trial Demanded**

OFFICER VINCENT NICOLO, individually and  :

in his official capacity; SERGEANT STEFANO  :

PRIOLO, individually and in his official capacity;  :

POLICE OFFICER KEVIN VELOZ, individually  :

and in his official capacity; and JOHN/JANE  :

DOES Nos. 1-10 (as of yet unidentified members  :

of the Police Department of the City of New York), :

                                   :

               Defendants.   :

                                   :

------------------------------------------------------------x

       Plaintiff WILSON GALARZA, by and through his attorneys, Kenneth Gilbert and Robert

T. Perry, alleges upon knowledge, information and/or belief as follows:

## PRELIMINARY STATEMENT

       1.     Wilson Galarza, a 34-year-old African American and Hispanic male who was

diagnosed as having schizophrenia and bi-polar and post-traumatic stress disorders in about

2013, brings this action under 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth

Amendments to the United States Constitution, Title II of the Americans with Disabilities Act of

1990, 42 U.S.C. §§ 12131 et seq. ("ADA"), and Section 504 of the Rehabilitation Act of 1973,

29 U.S.C. § 794 ("Rehabilitation Act").

2.      On March 12, 2017, in response to a 911 call from Mr. Galarza's wife that Mr. Galarza was having a mental health crisis, had struck her, and needed transport to a hospital, the individual defendants -- members of the Police Department of the City of New York ("NYPD") -- entered Mr. Galarza's home, escalated a tense situation, forced a physical confrontation, and used excessive force on Mr. Galarza, permanently blinding him in the right eye with a taser prong, in violation of Mr. Galarza's right to be free from unreasonable seizure under the Fourth Amendment (as applicable to state and local governments through the Fourteenth Amendment) to the United States Constitution.

3.      Despite a history of NYPD police officers mishandling encounters with people in mental crisis dating back to the 1980's, the City of New York (the "City") did not adopt a Crisis Intervention Team ("CIT") approach for such encounters -- an approach that emphasizes strategies for de-escalating the encounters, so as to reduce the likelihood of use of force -- until July 2015, and then only on a limited basis, long after the CIT model had become nationally accepted as a "best practice" for police encounters with people in mental crisis.

4.      On information and belief, the NYPD police officers who came to Mr. Galarza's home on March 12, 2017 lacked any CIT training.  On information and belief, as of March 12, 2017, only 25 percent of the NYPD's patrol force had received CIT training.  On information and belief, as of March 12, 2017, a 911 operator receiving a call concerning someone in mental crisis had no way of determining which patrol cars were staffed with CIT-trained officers, because the City had not yet upgraded its communications system to provide such information.

5.      The City's failure, through the NYPD, to dispatch a CIT-trained police officer to Mr. Galarza's home on March 12, 2017 led and/or contributed to the injuries that Mr. Galarza suffered on that date and continues to suffer, and evidenced deliberate indifference to Mr.

Galarza's right to be free from unreasonable seizure under the Fourth Amendment to the United States Constitution.

6.     On information and belief, the City, through the NYPD, has failed to adequately train and supervise police officers in the proper use of tasers.  That failure led and/or contributed to the injuries that Mr. Galarza suffered on March 12, 2017 and continues to suffer, and evidenced deliberate indifference to Mr. Galarza's right to be free from unreasonable seizure under the Fourth Amendment to the United States Constitution.

7.     In failing to dispatch a CIT-trained police officer to Mr. Galarza's home on March 12, 2017, the City, through the NYPD, discriminated against Mr. Galarza based on his disability and failed to make a reasonable accommodation for his disability, in violation of Title II of the ADA and Section 504 of the Rehabilitation Act.

8.     Mr. Galarza seeks a declaratory judgment that the City's customs, practices, and/or policies in effect on March 12, 2017 for police encounters with people in mental crisis and police use of tasers violated Mr. Galarza's right to be free from unreasonable seizure under the Fourth Amendment to the United States Constitution and right to be free from discrimination based on disability under Title II of the ADA and Section 504 of the Rehabilitation Act.  Plaintiff also seeks compensatory and punitive damages to the extent permitted by law.

## JURISDICTION AND VENUE

9.     The Court has subject matter jurisdiction over Mr. Galarza's claims under 28 U.S.C. §§ 1331 and 1343.

10.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Mr. Galarza's claims occurred in this district.

**JURY DEMAND**

11.     Mr. Galarza demands a trial by jury on each and every claim for which a jury trial is available under Fed. R. Civ. P. 38(b).

**PARTIES**

12.     Plaintiff WILSON GALARZA is a 34-year-old African American and Hispanic male who resides in Bronx County in the City and State of New York.

13.     Defendant THE CITY OF NEW YORK ("the City") is, and was at all relevant times, a municipal corporation duly organized and existing under the laws of the State of New York.  The City operates the Police Department of the City of New York ("NYPD"), which acts as the City's law enforcement agent and for which the City is ultimately responsible.  The City assumes the risks incidental to the maintenance of a police force and the employment of police officers, as said risks attach to the public consumers of the services provided by the NYPD.

14.     Defendant CARLOS AQUINO (Shield No. 4580) is, and was at all relevant times, a duly appointed agent, employee, officer, and servant of the NYPD.  At all relevant times, defendant Aquino was a police officer assigned to Police Service Area 8 ("PSA 8"), which serves the New York City Housing Authority developments within the confines of the 43rd and 45th Precincts in Bronx County.  Defendant Aquino is being sued in his individual and official capacities.

15.     Defendant CARLOS AVILES (Shield No. 3669) is, and was at all relevant times, a duly appointed agent, employee, officer, and servant of the NYPD.  At all relevant times, defendant Aviles was a police officer assigned to PSA 8.  Defendant Aviles is being sued in his individual and official capacities.

4

16.     Defendant HECTOR CAMACHO (shield number unknown) is, and was at all relevant times, a duly appointed agent, employee, officer, and servant of the NYPD.  At all relevant times, defendant Camacho was a police officer assigned to PSA 8.  Defendant Camacho is being sued in his individual and official capacities.

17.     Defendant VINCENT NICOLO (shield number unknown) is, and was at all relevant times, a duly appointed agent, employee, officer, and servant of the NYPD.  At all relevant times, defendant Nicolo was a police officer assigned to PSA 8.  Defendant Nicolo is being sued in his individual and official capacities.

18.     Defendant STEFANO PRIOLO (Shield No. 028283) is, and was at all relevant times, a duly appointed agent, employee, officer, and servant of the NYPD.  At all relevant times, defendant Priolo was a sergeant assigned to PSA 8.  Defendant Priolo is being sued in his individual and official capacities.

19.     Defendant KEVIN VELOZ (Shield No. 022881) is, and was at all relevant times, a duly appointed agent, employee, officer, and servant of the NYPD.  At all relevant times, defendant Veloz was a police officer assigned to PSA 8.  Defendant Veloz is being sued in his individual and official capacities.

20.     All "John Doe" and "Jane Doe" defendants are, and were at all relevant times, duly appointed agents, employees, officers, and servants of the NYPD.  The Doe defendants are being sued in their individual and official capacities.

21.     At all relevant times, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, employees, officers, and servants of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions and duties.  At all relevant times, the individual defendants

were acting for and on behalf of the NYPD, with the power and authority vested in them as agents, employees, officers, and servants of the NYPD.

22.     At all relevant times, the individual defendants acted jointly and in concert with each other.  Each individual defendant had the duty and the opportunity to protect Mr. Galarza from the unlawful actions of the other individual defendants but each individual defendant failed and refused to perform such duty, thereby proximately causing Mr. Galarza's injuries.

## STATEMENT OF FACTS

### Mr. Galarza's Mental Impairment

23.     For the past six years or so, Mr. Galarza has suffered from various mental illnesses.

24.     In about 2013 Mr. Galarza was diagnosed as having not only schizophrenia but also bi-polar and post-traumatic stress disorders.

25.     Mr. Galarza's mental impairment makes it difficult for him to control his emotions, relate to others, and function normally; he cannot work due to the impairment.

26.     To manage his condition, Mr. Galarza must take various medications.

27.     Through March 12, 2017, Mr. Galarza sometimes would not take his medications because they made him feel lethargic and light-headed and upset his stomach.

28.     Mr. Galarza's failure to take his medications left him susceptible to sudden angry outbursts.

29.     If Mr. Galarza failed to take his medications and became overly agitated, Christina Rodriguez, Mr. Galarza's wife, would call 911, requesting an ambulance to take Mr. Galarza to a hospital.

**The March 12, 2017 Incident**

30.     On March 12, 2017, Mr. Galarza was living with Ms. Rodriguez and their children in her apartment at 1635 East 174th Street in the Bronx.

31.     At about 4:30 p.m. that day, shortly after Ms. Rodriguez came home from work, Mr. Galarza became overly agitated and started arguing with Ms. Rodriguez.

32.     At one point during the argument Mr. Galarza struck Ms. Rodriguez on her head with his hand.

33.     Realizing that Mr. Galarza was off his medications, Ms. Rodriguez tried to call 911 on her cell phone but Mr. Galarza grabbed it from her hand and broke it.

34.     Ms. Rodriguez then called 911 from her apple watch at about 5:06 p.m., telling the operator that Mr. Galarza was schizophrenic and bi-polar and suffered from post-traumatic stress, that he was off his medications, that he was having a mental health crisis, that he had just struck her, and that he needed transport to a hospital.

35.     Ms. Rodriguez continued to speak with the 911 operator for about 15 minutes, until Mr. Galarza grabbed the apple watch from her hand.

36.     At about 5:22 p.m., in response to the 911 operator's report of an emotionally disturbed person in Ms. Rodriguez's apartment, defendants Aquino, Aviles, Camacho, Nicolo, Priolo, and Veloz arrived at the apartment, as Mr. Galarza was about to leave.

37.     Mr. Galarza initially blocked the officers' entry into the apartment but then stepped back, raised his hands above his head, still holding Ms. Rodriguez's apple watch in one hand, and asked "what's the charges?"

38.     The officers entered the apartment with guns drawn.

39.     Fearing for Mr. Galarza's safety, Ms. Rodriguez shouted out that Mr. Galarza was holding her apple watch, not a gun, in his hand.

40.     The officers then put away their guns and took out their tasers.

41.     Without prior warning, several officers -- on information and belief, Sergeant Priolo and Officer Veloz -- shot tasers at Mr. Galarza's upper body and head, one taser prong striking Mr. Galarza in his right eye and another taser prong almost striking an officer in the back before entering Mr. Galarza's chest.

42.     Mr. Galarza fell to the floor, blinded in his right eye.

43.     Even though Mr. Galarza was not threatening anyone with physical harm at the time, the officers rushed at Mr. Galarza and struck him about the body with closed fists.

44.     One officer taunted Mr. Galarza during the beating, telling him that Ms. Rodriguez was his (the officer's) and not Mr. Galarza's "bitch."

45.     The officers dragged Mr. Galarza to a rear bedroom, where they repeatedly struck Mr. Galarza about his head and body with closed fists, causing Mr. Galarza to lose consciousness.

46.     Mr. Galarza offered no physical resistance nor could he -- even to defend himself from the police assault -- after he was handcuffed behind his back.

47.     The force used by defendants Aquino, Aviles, Camacho, Nicolo, Priolo, and Veloz exceeded that necessary to take Mr. Galarza into custody and was entirely gratuitous.

48.     Mr. Galarza was taken by ambulance to Jacobi Medical Center, where he was diagnosed as having suffered a ruptured globe, detached retina, lacerated eyelid, and orbital fracture of his right eye.

49.     Mr. Galarza underwent emergency surgery that same day, March 12, 2017, on his right eye.

50.     Despite the surgery, Mr. Galarza remains unable to see anything but black and gray out of his right eye.

51.     While Mr. Galarza still can see out of his left eye, that eye is overly sensitive to light as a result of the police beating Mr. Galarza took on March 12, 2017, making it impossible for him to look at a computer, cell phone screen, or printed reading material for more than five minutes at a time without getting a headache.

52.     Since the March 12, 2017 incident, Mr. Galarza, who had no prior history of headaches, has suffered severe headaches daily.

53.     In addition to his physical injuries, Mr. Galarza suffered and continues to suffer emotional distress, mental anguish, shock, fright, apprehension, embarrassment, and humiliation as a result of what defendants Aquino, Aviles, Camacho, Nicolo, Priolo, and Veloz did to him on March 12, 2017.

**NYPD Policies For Police Encounters With People in Mental Crisis**

54.     On average, the NYPD receives more than 400 mental crisis calls daily.  New York City Department of Investigation, Officer of the Inspector General for the NYPD, *Putting Training into Practice: A Review of NYPD's Approach to Handling Interactions With People in Mental Crisis* (Jan. 2017) ("*Putting Training into Practice*") at 3 ("In 2016, NYPD received approximately 157,000 calls involving people in mental crisis."), https://www1.nyc.gov/assets/oignypd/downloads/pdf/Reports/CIT_Report_01192017.pdf.

A. __The NYPD's History of Mishandling Encounters with People in Mental Crisis__

55.    Dating back to the 1980's, there is a well-documented and widely reported history of NYPD police officers mishandling encounters with people in mental crisis, sometimes resulting in death, including, but not limited to, Eleanor Bumpurs in 1984, Gidone Busch in 1999, Khiel Coppin and David Kostovski in 2007, Iman Morales in 2008, Shereese Francis and Mohamed Bah in 2012, David Felix and Anthony Andre Paul II 2015, and Deborah Danner in 2016.

56.    On October 29, 1984, an NYPD police officer, using a 12-gauge shotgun, fatally shot Eleanor Bumpurs, an elderly, disabled woman, inside her public housing apartment in the Bronx.  NYPD police officers had come to Ms. Bumpurs's home to enforce an eviction order and remove her to a hospital.  Housing authority workers had reported that Ms. Bumpurs was emotionally disturbed, had threatened to throw boiling lye, and was using a knife to resist eviction.  The NYPD police officer who fatally shot Ms. Bumpurs was indicted on a second-degree manslaughter charge but later acquitted.  The City agreed to pay $200,000 to the Bumpurs family to settle a civil lawsuit.  Following the Bumpurs killing, the NYPD developed new protocols for dealing with people in mental crises and began using tasers, as an alternative to the use of firearms, when dealing with such people, though unfortunately the NYPD failed to provide for the involvement of mental health professionals in the new protocols.

57.    On August 30, 1999, NYPD police officers fatally shot Gidone Busch, a 31-year-old man with a history of mental illness and prior involuntary commitments, outside his apartment in Borough Park.  The officers had come to Mr. Busch's home in response to an anonymous 911 call that Mr. Busch was menacing children with a claw hammer.  A homeless man present in Mr. Busch's apartment at the time told the officers that Mr. Busch, an observant

Jew, regarded the hammer as a "religious object" and not a weapon.  They nonetheless shot Mr. Busch to death.  A grand jury declined to indict the officers.  The Busch family filed a civil lawsuit.  Following a jury verdict for the defense, the judge granted a new trial, but the Busch family declined to proceed.

58.     On November 12, 2007, NYPD police officers fatally shot Khiel Coppin, an 18-year-old man with a history of mental illness, outside his home in Bedford-Stuyvesant.  The officers had come to Mr. Coppin's home in response to a 911 call from his mother reporting domestic abuse.  When they entered the home, Mr. Coppin climbed out the first-floor window onto the fire escape.  Five police officers fired 20 bullets at Mr. Coppin.  At the time of the shooting, Mr. Coppin was holding a hairbrush.

59.     On November 16, 2007, NYPD police officers fatally shot David Kostovski, a 29-year-old man with a history of mental illness, on a public street in Bedford-Stuyvesant, near his home.  Mr. Kostovski's roommate had called 911.  The men had fought, and both had suffered stab wounds.  Mr. Kostovski left the apartment shirtless and bleeding from the neck.  Two police officers cornered him about six blocks away.  They drew their guns.  One officer ordered Mr. Kostovski to drop his "knife," an apparent reference to a broken bottle neck that Mr. Kostovski was holding in his hand.  Mr. Kostovski allegedly raised the bottle and lunged forward.  The officers fired 12 shots, killing him.

60.     On September 23, 2008, Iman Morales, a 35-year-old man with a history of mental illness, fell to his death from a building ledge outside his apartment in Bedford-Stuyvesant after an NYPD police officer shot him with a taser.  NYPD police officers had come to Mr. Morales's home in response to a 911 call from Mr. Morales's mother reporting that Mr. Morales was behaving erratically.  The officers chased Mr. Morales, who was naked, out onto

the fire escape.  Before he was tasered, Mr. Morales had been yelling at passersby and waving a

long light bulb at NYPD police officers.  The lieutenant who ordered the tasering of Mr. Morales

committed suicide shortly after the incident.  The City agreed to pay the Morales family

$700,000 to settle a civil lawsuit.

61.     On March 15, 2012, Shereese Francis, an unarmed 29-year-old woman with a

history of mental illness, was killed by NYPD police officers who had come to Ms. Francis's

home in Rochdale, Queens in response to her sister's call to 311 (transferred to 911) requesting

an ambulance to take Ms. Francis to the hospital.  Inside Ms. Francis's home, police officers

tased her, wrestled her onto a bed, with four officers on top of her, pressed her face down, and

handcuffed her.  Ms. Francis stopped breathing.  She was later pronounced dead.  The City

agreed to pay the Francis family $1.1 million to settle a civil lawsuit.

62.      On September 25, 2012, an NYPD police officer fatally shot Mohamed Bah, a

28-year-old man with a history of mental illness, inside his apartment in Harlem.  NYPD police

officers had come there in response to a 911 call from Mr. Bah's mother, who reported that Mr.

Bah was having a mental health crisis and needed transport to a hospital.  The officers breached

and entered Mr. Bah's apartment.  Mr. Bah was then shot to death.  The City agreed to pay the

Bah family $2.2 million to settle a civil lawsuit.

63.     On April 25, 2015, an NYPD police officer fatally shot David Felix, a 24-year-old

man with a history of mental illness, in Mr. Felix's supportive living facility on the Lower East

Side.  Police officers had come there to speak with Mr. Felix about his alleged involvement in a

robbery.  Assisted by a facility employee, they gained entrance to Mr. Felix's apartment without

his consent.  Mr. Felix, who had developed a serious fear of law enforcement from a prior

incident, panicked.  He escaped out a window and down a fire escape to the lobby, where he was

shot to death by an officer.  The Felix family has brought a civil lawsuit against the City.

64.     On July 1, 2015, Anthony Andre Paul II, a 29-year-old man with a history of

mental illness, died after NYPD police officers subdued him in his apartment in a halfway house

in the Bronx.  The officers had come there in response to a 911 call about an emotionally

disturbed person.  Mr. Paul, who was naked, refused them entry.  Using an electric saw, the

officers breached the door.  Pressed against the door from inside, Mr. Paul suffered 30 cuts to his

hands and arms from the saw.  Once they entered the apartment, the officers tased Mr. Paul

multiple times.  After being handcuffed, Mr. Paul was taken to North Central Bronx Hospital,

where he suffered cardiac arrest.  The Paul family has brought a civil lawsuit against the City.

65.     On October 18, 2016, an NYPD police officer fatally shot Deborah Danner, an

elderly woman with a history of mental illness, inside her apartment in the Bronx.  NYPD police

officers had come there in response to a neighbor's 911 call that Ms. Danner had been behaving

erratically.  Ms. Danner, who was naked, defended herself from the intruders first with a pair of

scissors and later a baseball bat.  The officer who shot Ms. Danner to death was arrested and

charged with second-degree murder but later acquitted.  NYPD Commissioner James O'Neill

conceded that the NYPD had "failed" Ms. Danner.  Mayor De Blasio stated that Ms. Danner's

shooting was "tragic and unacceptable" and "should never have happened."  The City agreed to

pay the Danner family $2 million to settle a civil lawsuit

    **B**.     **The Crisis Intervention Team Model: A National Best Practice**

66.     Recognizing that encounters with people in mental crisis present police officers

with difficult choices that could be made less difficult by better training and supervision, and that

the wrong choice will frequently cause the deprivation of someone's constitutional rights, more

than 2,600 police departments throughout the United States have adopted a Crisis Intervention Team ("CIT") model for such encounters. *Putting Training into Practice* at 8.

67.     First developed by the City of Memphis in the mid-1980's after the fatal shooting of a person in mental crisis by a Memphis police officer, the CIT model is now accepted as a "national best practice" for police encounters with people in mental crisis. *Putting Training into Practice* at 8.

68.     CIT training emphasizes strategies for de-escalating police encounters with people in mental crisis, to reduce the likelihood of use of force and increase police officers' capacity to successfully resolve the encounters. *Putting Training into Practice* at 8.

69.     CIT training typically entails a five-day course of 40 hours in which police officers receive instruction on the clinical aspects of varying mental disorders, their common symptomatic presentations and treatment approaches, and suicide/harm presentation tactics, and also learn de-escalation strategies through role-playing scenarios involving people in crisis. *Putting Training into Practice* at 8.

70.     Police officers receiving CIT training are taught, among other things, that shouting at, surrounding, threatening, and rushing people in mental crisis is almost always counterproductive.

### C.     The NYPD's Belated Adoption of a Crisis Intervention Team Model

71.     Even though City and NYPD policy makers long before 2015 knew to a moral certainty that encounters with people in mental crisis presented NYPD police officers with difficult choices that could be made less difficult by better training and supervision, and that the wrong choice frequently caused the deprivation of someone's constitutional rights, the NYPD

did not adopt a CIT model until the summer of 2015, and even then only on a limited basis. *Putting Training into Practice* at 10-11.

72.     The NYPD's belated adoption of a CIT model in mid-2015 was a tacit acknowledgment that its protocol then in effect for police encounters with people in mental crisis was woefully inadequate -- a failure -- in protecting the constitutional rights of people in mental crisis.

73.     Despite the urgent need for better training for NYPD police officers in handling encounters with people in mental crisis, the NYPD only slowly began its roll out of CIT training.

74.     As of January 2017, only 5,500 or so NYPD police officers -- about 25% of the NYPD's patrol force at the time -- had completed CIT training.  *Putting Training into Practice* at 11, 30.

75.     As of January 2017, most NYPD police officers still only received the one-day (pre-CIT) training on how to handle encounters with people in mental crisis, consisting of a short, basic lecture on mental illnesses in the morning and role-playing scenarios in the afternoon, with no opportunity to interact with anyone living with mental illness or evaluation or testing after the training was complete.  *Putting Training into Practice* at 10.

76.     As of January 2017, a 911 operator receiving a call concerning a person in mental crisis had no way of determining which patrol cars were staffed with CIT-trained police officers, because the City had not yet upgraded its communications system to provide such information. *Putting Training into Practice* at 13.

77.     As of January 2017, the NYPD's written policies on responding to people in mental crisis did not mention either the need to have CIT-trained police officers respond to the

scene of a mental health crisis or the need to use CIT de-escalation techniques in such encounter. *Putting Training into Practice* at 17.

78.     The shortcomings in the NYPD's implementation of a CIT model prompted the New York City Department of Investigation, Officer of the Inspector General for the NYPD ("OIG-NYPD") to issue a report in January 2017 identifying major deficiencies in the NYPD's nascent CIT program.  *Putting Training into Practice* at 12-27.

79.     In the introduction to its report, the OIG-NYPD criticized the "NYPD's failure to fully integrate and use [the CIT] training within the totality of NYPD's everyday policing." *Putting Training into Practice* at 1.

80.     The OIG-NYPD observed, among other things, that the NYPD was not systematically assigning CIT-trained police officers to mental health crisis incidents, not only because most of the NYPD's patrol force had not received CIT training but also because 911 operators had no way of determining which patrol cars were staffed with CIT-trained police officers.  *Putting Training into Practice* at 12-14.

81.     The OIG-NYPD also noted that the NYPD had not yet adjusted its written policies to reflect the goals of a CIT program.  *Putting Training into Practice* at 17-23.

82.     In delaying and limiting the introduction of a CIT model, the City, through the NYPD, acted in deliberate indifference to the constitutional rights of people in mental crisis.

83.     On information and belief, defendants Aviles, Aquino, Camacho, Nicolo, Priolo, and Veloz -- the officers who entered Mr. Galarza's home on March 12, 2017 -- lacked any CIT training.

84.     Defendants Aviles, Aquino, Camacho, Nicolo, Priolo, and Veloz not only lacked CIT training but they also violated the NYPD's protocol in effect on March 12, 2017 for

encounters with people in mental crisis.  NYPD Patrol Guide 221-13 (effective June 1, 2016) ("NYPD Patrol Guide 221-13").

85.     Where, as here (*see* ¶¶ 37-39 *supra*), the actions of a person in mental crisis posed no immediate threat of serious physical injury or death to himself or others, NYPD Patrol Guide 221-13 directed officers to attempt to isolate and contain the person while maintaining a zone of safety until the arrival of a patrol supervisor or Emergency Service Unit personnel.  NYPD Patrol Guide 221-13, at p. 1.

86.     Defendants Aviles, Aquino, Camacho, Nicolo, Priolo, and Veloz instead escalated the encounter, taunted Mr. Galarza, forced a physical confrontation with him, and used excessive force on Mr. Galarza, and without waiting for the arrival of a patrol supervisor or Emergency Service Unit personnel, in direct and flagrant violation of NYPD Patrol Guide 221-13.

87.     On information and belief, on March 12, 2017, most NYPD police officers on patrol, including defendants Aviles, Aquino, Camacho, Nicolo, Priolo, and Veloz, lacked not only any CIT training but also adequate training and supervision in how to respond to people in mental crisis under NYPD Patrol Guide 221-13.

88.     In failing to adequately train and supervise NYPD police officers in how to respond to people in mental crisis under NYPD Patrol Guide 221-13, the City, through the NYPD, acted in deliberate indifference to the constitutional rights of people in mental crisis.

89.     The City's failure, through the NYPD, to dispatch a CIT-trained police officer to Mr. Galarza's home on March 12, 2017 led and/or contributed to the injuries that Mr. Galarza suffered on March 12, 2017 and continues to suffer.  *Cf. Putting Training into Practice* at 1 (noting that the NYPD police officer who fatally shot Deborah Danner in October 2016 had not yet received CIT training); Grace Smith, *As Deaths Mount, Scrutiny of NYPD Response to*

17

*Emotionally Disturbed Persons,* Gotham Gazette, Sept. 27, 2017 (noting that the NYPD police officer who fatally shot Dwayne Jeune, an emotionally disturbed Brooklyn man, in July 2017, was the only one of four NYPD police officers present who lacked CIT training and that the same officer had been involved in another shooting of an emotionally disturbed person in October 2016 but thereafter had not been given CIT training), https://www.gothamgazette.com/city/7216-as-deaths-mount-scrutiny-of-nypd-response-to-emotionally-disturbed-persons.

90.     The City's failure, through the NYPD, to adequately train and supervise NYPD police officers to comply with Patrol Guide 221-13, the NYPD protocol in effect on March 12, 2017 for police encounters with people in mental crisis, also led and/or contributed to the injuries that Mr. Galarza suffered on March 12, 2017 and continues to suffer.

**NYPD Policies For Police Use of Tasers**

91.     Since 2006, the NYPD has greatly expanded the use of tasers, from 160 in 2006 to 1,710 in 2016 to 2,372 in 2017  Joseph Goldstein, *New York Police Embracing a Weapon They Have a Complicated Past With: Tasers*, N.Y. Times, July 27, 2016, https://www.nytimes.com/2016/07/28/nyregion/new-york-police-embracing-a-weapon-they-have-a-complicated-past-with-tasers; New York City Civilian Complaint Review Board, *Taser Use in CCRB Complaints, 2014-2017* (Dec. 2019) ("*Taser Use in CCRB Complaints, 2014-2017*"), https://www1.nyc.gov/assets/ccrb/downloads/pdf/policy_pdf/issue_based/20191205_TaserReport.pdf.

92.     In June 2016, the New York City Civilian Complaint Review Board ("CCRB") forwarded to the Mayor's Office and the NYPD a draft report on police officer use of tasers between 2014 and 2015.  Goldstein, *supra.*

93.     The CCRB found, in the draft report, that police officers usually were using tasers to subdue unarmed people or those already in custody, not to stop someone who has put the life of a police officer or someone else in peril.  Goldstein, *supra*.

94.     The final report issued by the CCRB in December 2016, however, omitted that troubling finding, reportedly due to pressure from the NYPD.  J. David Goodman, *Complaint Board Softened Report on Police Use of Tasers*, N.Y. Times, Dec. 26, 2016, https://www. nytimes.com/2016/12/26/nyregion/complaint-board-softened-report-on-police-use-of-tasers.

95.     In both the draft and final reports, the CCRB recommended that the NYPD issue an annual report on police officer use of tasers.  *Id.*

96.     To date, the NYPD has issued only aggregate statistics on police officer use of tasers.  *See, e.g.,* NYPD, *Use of Force Report 2017* at 30 (728 Conducted Electrical Weapon discharges in 2017, including 296 in arrest situations and 228 in situations involving emotionally disturbed persons; no mention of whether individuals were armed or unarmed or posing threats to themselves, police officers, or third parties), https://www1.nyc.gov/assets/nypd/downloads/ pdf/use-of-force/use-of-force-2017.pdf.

97.     Despite the NYPD's limited disclosures, the media reported at least seven troubling incidents involving police officer use of tasers on unarmed civilians between 2015 and 2018.

98.     In June 2015, a sergeant twice tasered Mario Ocasio, an unarmed, emotionally disturbed, 51-year old man inside his apartment in the Bronx after Mr. Ocasio had been handcuffed by other officers; Mr. Ocasio was pronounced dead later that evening.  Victoria Bekiempis, *Lawsuit: NYPD Withholding Evidence in Alleged Taser Death*, Oct. 13, 2016,

https://www.newsweek.com/nypd-police-involved-death-taser-new-york-police-department-382325.

99.     In July 2015, police officers repeatedly tased Anthony Paul II, an unarmed, emotionally disturbed, 29-year-old man inside his apartment in the Bronx; later that night, Mr. Paul died of cardiac arrest.  Emma Whitford, *Family of Man Who Died After Being Tasered Sues for $25 Million*, Gothamist, Mar. 16, 2016, https://gothamist.com/news/family-of-man-who-died-after-being-tasered-by-nypd-sues-for-25-million.

100.    In November 2016, Ariel Galarza, an unarmed, emotionally disturbed, 49-year-old man, died in his home in the Bronx after a police officer twice used a taser on him.  Eli Rosenberg, *New York Attorney General to Investigate Taser Death of Bronx Man*, N.Y. Times, Nov. 5, 2016, https://www.nytimes.com/2016/11/05/nyregion/bronx-man-taser-death.

101.    In February 2017, a police officer tased Dailene Rosario, an unarmed, pregnant, 17-year-old woman, in her right torso outside her family's apartment in the Bronx.  Andy Mai, *NYPD Investigates Sergeant Who Used Taser on Pregnant 17-Year-Old in the Bronx*, N.Y. Daily News, Feb. 15, 2017, https://www.nydailynews.com/new-york/nypd-cops-shock-pregnant-teen-taser-bronx-article-1.2972518.

102.    In April 2017, a police officer threatened to use a taser on an unarmed Midwood High School student who had talked back to the officer and tossed snow at him.  *Police Review Video in Which Officer Pulls Taser in Confrontation With High School Student*, CBS NY, Apr. 2, 2017, https://newyork.cbslocal.com/2017/04/02/police-video-in-which-officer-pulls-taser-in-confrontation-with-high-school-student.

103.    In January 2018, a police officer repeatedly tased Sean Marcellin, an unarmed, 24-year-old man pulled over for a traffic infraction, even though Mr. Marcellin was already in

police custody and being held by other officers.  *NYPD Reviewing Taser Gun Use During Queens Traffic Stop*, NY1 News, Jan. 16, 2018, https://www.ny1.com/nyc/queens/news/2018/01/16/nypd-reviewing-queens-tase-arrest-.

104.    In October 2018, a police officer tased William Colon, an unarmed, 24-year-old man with mental and physical impairments, in the back after other officers had forced Mr. Colon to the floor, handcuffed him behind his back, and rolled him onto his stomach.  *Video of NYPD Officers Tasering SI Man Sparks Investigations*, abc7ny.com, Oct. 10, 2018, https://abc7ny.com/video-of-nypd-tasering-si-man-sparks-investigations/4456353/.

105.    The relevant NYPD protocol for police use of tasers in effect on March 12, 2017 provided that tasers "should only be used against persons who are actively resisting, exhibiting active aggression, or to prevent individuals from physically injuring themselves or other person(s) actually present" and prohibited the use of such weapons "in situations that do not require the use of physical force."  NYPD Patrol Guide 221-08 (effective June 12, 2016) ("NYPD Patrol Guide 221-08"), at p. 1.

106.    The same protocol also stated that NYPD police officers should avoid discharging tasers "at an individual's head, neck, and chest, if possible."  NYPD Patrol Guide 221-08, at p. 5.

107.    The protocol further provided that prior to discharging a taser, an NYPD police officer should "issue if possible, an appropriate verbal warning, consistent with personal safety, to the intended subject."  NYPD Patrol Guide 221-08, at p. 5.  (Until June 12, 2016, NYPD police officers were required to "issue an appropriate warning, consistent with personal safety, to the intended subject . . . prior to discharging the [taser].")

108.    The NYPD police officers who fired their tasers at Mr. Galarza on March 12, 2017 violated NYPD Patrol Guide 221-08 in three ways: first, in using their tasers against

someone who was not actively resisting, exhibiting active aggression, or about to injure himself or other persons; second, in not issuing an appropriate verbal warning prior to discharging their tasers, though it was possible to give such a warning; and third, in discharging their tasers at Mr. Galarza's head and chest, though it was possible to aim the weapons lower.

109.   In December 2019, the CCRB issued a report on taser use by NYPD police officers, as documented in 90 fully-investigated complaints closed by the CCRB between 2014 and 2017 in which the use of a taser was independently verified or undisputed. *Taser Use in CCRB Complaints, 2014-2017* at 6.

110.   The CCRB found that a significant number of cases involved complainants who appeared to have been in the midst of a mental health crisis at the time they were tased. *Taser Use in CCRB Complaints, 2014-2017* at 7.

111.   The share of complainants who appeared to be having a mental health crisis increased from 37% in 2015 to 67% in 2016. *Taser Use in CCRB Complaints, 2014-2017* at 12.

112.   Though the CCRB found in the majority of cases that the accused NYPD police officer used the taser in accordance with NYPD Patrol Guide standards, the CCRB also found that NYPD police officers gave civilians adequate warnings in advance of taser use in only 37% of the cases; that NYPD police officers gave civilians no warnings, either verbally or non-verbally in 43% of cases; that NYPD police officers only warned other officers and not civilians in another 9% of the cases; and that NYPD police officers gave verbal warnings to civilians but gave them no time to comply before discharging the taser in another 5% of the cases. *Taser Use in CCRB Complaints, 2014-2017* at 12.

113.   On information and belief, on March 12, 2017, many NYPD police officers, including the officers who fired their tasers at Mr. Galarza, lacked adequate training and

supervision in the proper use of tasers.  (The CCRB found that while the taser training given to NYPD police officers who received CIT training was adequate, the training given to executives -- supervisors including captains and above -- lacked an appropriate focus on de-escalation as a preferred first approach with people in mental crisis. *Taser Use in CCRB Complaints, 2014-2017* at 56.).

114.    On information and belief, on March 12, 2017, the NYPD's training of police officers in the use of tasers was deficient in at least three respects: first, in failing to adequately train police officers to refrain from using tasers against someone who is not actively resisting, exhibiting active aggression, or about to injure himself or other persons; second, in failing to adequately train police officer to issue an appropriate verbal warning prior to discharging their tasers, when it is possible to give such a warning; and third, in failing to train police officers not to discharge their tasers at a civilian's head and chest, though it is possible to aim much lower.

115.    The NYPD declined to impose any discipline against three police officers found by the CCRB to have misused their tasers and imposed only vacation forfeiture against three other police officers found by the CCRB to have misused their tasers. *Taser Use in CCRB Complaints, 2014-2017* at 27.

116.    Long before March 12, 2017, City and NYPD policy makers knew to a moral certainty that taser use presented NYPD police officers with difficult choices that could be made less difficult by better training and supervision, and that the wrong choice frequently caused the deprivation of someone's constitutional rights.

117.    In failing to adequately train and supervise NYPD police officers in the use of tasers, the City, through the NYPD, acted in deliberate indifference to the constitutional rights of people in mental crisis.

118.     The City's failure, through the NYPD, to adequately train and supervise NYPD police officers in the use of tasers led and/or contributed to the injuries that Mr. Galarza suffered on March 12, 2017 and continues to suffer.

## FIRST CLAIM FOR RELIEF

**Excessive Force Claim Under 42 U.S.C. § 1983**
**(Against Defendants Aquino, Aviles, Camacho, Nicolo, Priolo, and Veloz)**

119.     Mr. Galarza realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

120.     Defendants Aquino, Aviles, Camacho, Nicolo, Priolo, and Veloz, acting in concert and within the scope of their authority, used objectively unreasonable force on Mr. Galarza on March 12, 2017, in violation of Mr. Galarza's right to be free from unreasonable seizure under the Fourth Amendment to the United States Constitution.

## SECOND CLAIM FOR RELIEF

**Failure to Intervene Claim Under 42 U.S.C. § 1983**
**(Against Defendants Aquino, Aviles, Camacho, Nicolo, Priolo, and Veloz)**

121.     Mr. Galarza realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

122.     Defendants Aquino, Aviles, Camacho, Nicolo, Priolo, and Veloz each had an affirmative duty to intervene on behalf of Mr. Galarza, whose constitutional rights were being violated in that defendant's presence by other police officers, but failed to intervene to prevent the unlawful conduct, despite having a realistic opportunity to do so, in violation of Mr. Galarza's right to be free from unreasonable seizure under the Fourth Amendment to the United States Constitution.

**THIRD CLAIM FOR RELIEF**

**Monell Claim Under 42 U.S.C. § 1983**
**(Against Defendant City)**

123.    Mr. Galarza realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

124.    At all relevant times, the City, through the NYPD, maintained a custom, practice, and/or policy of not dispatching CIT-trained police officers to most police encounters with people in mental crisis.

125.    The above custom, practice, and/or policy evidenced the City's deliberate indifference to the constitutional rights of people in mental crisis like Mr. Galarza and allowed for the individual defendants to violate Mr. Galarza's right to be free from unreasonable seizure under the Fourth Amendment to the United States Constitution.

126.    As a result of the above custom, practice, and policy, Mr. Galarza suffered injuries on March 12, 2017 and continues to suffer injuries, including the loss of sight in his right eye and severe daily headaches.

127.    On information and belief, at all relevant times, the City, through the NYPD, failed to adequately train and supervise police officers in the proper handling of police encounters with people in mental crisis.

128.    The above failure to train and supervise evidenced the City's deliberate indifference to the constitutional rights of people in mental crisis like Mr. Galarza and allowed for the individual defendants to violate Mr. Galarza's right to be free from unreasonable seizure under the Fourth Amendment to the United States Constitution.

129.     As a result of the above failure to train and supervise, Mr. Galarza suffered

injuries on March 12, 2017 and continues to suffer injuries, including the loss of sight in his right

eye and severe daily headaches.

130.     On information and belief, at all relevant times, the City, through the NYPD,

failed to adequately train and supervise police officers in the proper use of tasers.

131.     The above failure to train and supervise evidenced the City's deliberate

indifference to the constitutional rights of people in mental crisis and allowed for the individual

defendants to violate Mr. Galarza's right to be free from unreasonable seizure under the Fourth

Amendment to the United States Constitution.

132.     As a result of the above failure to train and supervise, Mr. Galarza suffered

injuries on March 12, 2017 and continues to suffer injuries, including the loss of sight in his right

eye and severe daily headaches.

## FOURTH CLAIM FOR RELIEF

**Failure to Make Reasonable Accommodation Claim Under Title II of the ADA and Section 504 of the Rehabilitation Act
(Against Defendant City)**

133.     Mr. Galarza realleges and incorporates by reference the allegations set forth in the

foregoing paragraphs as if fully set forth herein.

134.     Title II of the ADA prohibits any public entity from discriminating against a

"qualified individual with a disability" in the provision of "services, programs, or activities."  42

U.S.C. §§ 12131(2), 12132.

135.     Similarly, Section 504 of the Rehabilitation Act provides that no otherwise

qualified individual with a disability "shall, solely by reason of her or his disability, be excluded

from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. §794.

136.    The City is a public entity, and the NYPD receives federal financial assistance.

137.    Mr. Galarza is, and was at all relevant times, a qualified individual with a disability by virtue of his mental impairment -- schizophrenia and bipolar and post-traumatic stress disorders -- which substantially limits several of his major life activities, including, but not limited to, his ability to work and interact with others.

138.    The police officers who interacted with Mr. Galarza on March 12, 2017 regarded Mr. Galarza as a qualified individual with a disability, inasmuch as Ms. Rodriguez told the 911 operator of Mr. Galarza's mental impairment and that information was forwarded by the 911 operator to the officers.

139.    For purposes of both the ADA and Rehabilitation Act, discrimination includes a failure to reasonably accommodate a person's disability, unless the entity can demonstrate that the modifications necessary to reasonably accommodate the person's disability would fundamentally alter the nature of the service, program, or activity.  42 U.S.C. § 12182(b)(2)(A)(ii); 28 C.F.R. § 35.130(b)(7)(i).

140.    In failing to dispatch a CIT-trained officer to Mr. Galarza's home on March 12, 2017, in response to Ms. Rodriguez's 911 call, the City discriminated against Mr. Galarza based on his disability and failed to make a reasonable accommodation for Mr. Galarza's disability -- a modification that would not have fundamentally altered any police service, program, or activity -- in violation of Mr. Galarza's rights under Title II of the ADA and Section 504 of the Rehabilitation Act.

141.     In failing to adequately train and supervise NYPD police officers to follow Patrol Guide 221-13, the protocol in effect on March 12, 2017 for police encounters with people in mental crisis, the City discriminated against Mr. Galarza based on his disability and failed to make a reasonable accommodation for Mr. Galarza's disability -- a modification that would not have fundamentally altered any police service, program, or activity -- in violation of Mr. Galarza's rights under Title II of the ADA and Section 504 of the Rehabilitation Act.

142.     In failing to follow NYPD Patrol Guide 221-13, the NYPD protocol then in effect on March 12, 2017 for police encounters with people in mental crisis, defendants Aquino, Aviles, Camacho, Nicolo, Priolo, and Veloz, acting under color of state law in the course and scope of their duties and functions as agents, employees, officers, and servants of the NYPD, discriminated against Mr. Galarza based on his disability and failed to make a reasonable accommodation for Mr. Galarza's disability -- a modification that would not have fundamentally altered any police service, program, or activity -- in violation of Mr. Galarza's rights under Title II of the ADA and Section 504 of the Rehabilitation Act.

143.     As a direct and proximate result of defendants' discriminatory conduct, Mr. Galarza suffered and continues to suffer injuries, including the loss of sight in his right eye and severe headaches daily.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Galarza demands the following relief against the defendants, jointly and severally:

(a)     compensatory damages in an amount just and reasonable and in conformity with the evidence at trial;

(b)     punitive damages against the individual defendants;

(c)     an order declaring that the NYPD's current policies and procedures with respect to police responses to situations involving people in mental crisis violate 42 U.S.C. § 1983, and the Fourth Amendment to the United States Constitution;

(d)     an order declaring that the NYPD's current policies and procedures with respect to police responses to situations involving people in mental crisis violate Title II of the ADA and Section 504 of the Rehabilitation Act;

(e)     an injunction requiring the City to institute and implement adequate policies and procedures with respect to police responses to 911 calls concerning people in mental crisis;

(f)     reasonable attorneys' fees and costs of this litigation; and

(g)     such other and further relief as this Court deems just and proper.

Dated:  New York, New York
        March 6, 2020

                              Respectfully submitted,

                              _____/s/_____
                              KENNETH GILBERT
                              kenny@kennethgilbertlaw.com
                              2297 Seventh Avenue
                              First Floor
                              New York, New York 10030
                              (212) 234-8494

                              _____/s/_____
                              ROBERT T. PERRY
                              rtperry32@gmail.com
                              300 Cadman Plaza West
                              12th Floor
                              Brooklyn, New York 11201
                              (347) 415-5272

                              *Counsel for Plaintiff*