```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
WILSON GALARZA,

                                       Plaintiff,            19-CV-10898 (LAK) (KHP)
                                                             OPINION AND ORDER
                  -against-                                  ON MOTION TO EXCLUDE
                                                             EXPERT TESTIMONY
CITY OF NEW YORK, et al.,


                                       Defendants.
-----------------------------------------------------------------X
```

**KATHARINE H. PARKER, United States Magistrate Judge:**

Plaintiff Wilson Galarza ("Plaintiff") commenced this action against the City of New York and several New York Police Department ("NYPD") officers (collectively, "Defendants") pursuant to 42 U.S.C. § 1983, Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.  The parties are in the process of exchanging discovery.  On February 28, 2023, Plaintiff produced the report ("Report") of his police practices expert, Michael Leonesio ("Leonesio").  Defendants moved to preclude Plaintiff from relying on Leonesio's opinions, arguing that his opinions do not satisfy the standards for admissibility of expert testimony under the federal rules of evidence.  (ECF No. 131.)[1]  For the reasons stated below, the motion is GRANTED.

BACKGROUND

1. **Allegations in the First Amended Complaint ("FAC")**

According to the FAC, Plaintiff is an African American and Hispanic male with diagnoses of schizophrenia, bi-polar disorder, and post-traumatic stress disorder.  On March 12, 2017,

---

[1] Defendants also requested that the Court stay the deadline for their rebuttal report until a date after the Court has resolved whether Plaintiff may rely on Leonesio's opinions.  The Court granted that request.  (ECF No. 133.)

Plaintiff's wife called 911 and reported that Plaintiff was having a mental health crisis. (FAC ¶ 34.) Six NYPD officers responded to the call and entered Plaintiff's home with their guns drawn. (*Id.* ¶¶ 36, 38.) Plaintiff initially attempted to block the officers' entry, but ultimately stepped back, raised his hands above his head, and asked what he was being charged with. (*Id.* ¶ 37.) The officers then put their guns away and took out their TASERs. (*Id.* ¶ 41.) Two officers, Sergeant Stefano Priolo and Officer Kevin Veloz, used their TASERs on Plaintiff, and a TASER prong deployed by Officer Veloz struck Plaintiff in the eye and caused him to fall to the floor. (*Id.*) The officers then handcuffed Plaintiff and dragged him to a bedroom, where they repeatedly struck him on his head and body, causing him to lose consciousness. (*Id.* ¶¶ 43-45.)

Officer Veloz testified at his deposition that early on in the encounter, he delivered closed-fist strikes to Plaintiff for about 15 seconds to assist another officer in controlling Plaintiff. However, Defendants deny that the officers beat Plaintiff for a prolonged period. (Answer to FAC, ¶¶ 43-45.)

Following the encounter, Plaintiff was taken by ambulance to the Jacobi Medical Center where he was diagnosed with a ruptured globe, detached retina, lacerated eyelid, and orbital fracture below his right eye. (FAC ¶ 48.) As a result of his injuries, Plaintiff is largely unable to see out of his right eye and suffers from regular headaches. (*Id.* ¶¶ 50-53.)

   2. **The Report**

Plaintiff proffers Leonesio as an expert on police practices to opine on the cause of the orbital fracture below Plaintiff's right eye.

   a. **Qualifications**

Leonesio is a graduate of San Napa Valley College. From 1987 to 1990, he was a flight medic with the police department in Hayward, California. From 1985 to 2001, he was an

emergency medical technician ("EMT") in California.  From 2001 to 2012, Leonesio was a police officer in California, at first in San Carlos and subsequently in Oakland.  His duties included researching, writing, reviewing, and implementing department policy, procedure, and training curricula related to use of force.  He sat as a subject matter expert on the Use of Force Review Boards at both the San Carlos and Oakland police departments, and he has reviewed, analyzed, and rendered opinions in thousands of force cases.  He also developed and implemented the Oakland Police Department's electroshock weapon ("ESW") program.[2]

Leonesio is a Peace Officer Standards and Training ("POST") certified police academy instructor and has completed numerous officer training courses.  As a certified instructor, he has trained thousands of police officers on subjects including tactical firearms and critical incident response.  He graduated from several TASER® International (Axon Enterprises) user, instructor, master instructor, and armorer courses.  Leonesio is also certified as a forensic analyst by the Institute for the Prevention of In-Custody Deaths ("IPICD") and is an instructor in IPICD programs, including the ESW Forensic Analyst course, which he co-developed.

Since 2008, Leonesio has served as the founder and principal of Leonesio Consulting, LLC, which is an independent facility that exclusively tests ESWs.  Through this role, he has served as a subject matter expert in law enforcement policies and practices, arrest and detention procedures, and law enforcement use of force.  He has testified as an expert witness in state and federal court proceedings in the areas of police practices and procedures, use of force analysis and investigation, law enforcement training and policy, and ESW use, training, policy, and testing.  He is familiar with "generally accepted law enforcement standards and

---

[2] "ESW" is the term for electronic weapons commonly used by law enforcement, and TASERs are a type of ESW.

3

practices relating to detentions, arrests, use of force and restraint, and the use of weapons and tactics," including those set by courts, federal agencies, and research organizations.

### b. Methodology and Conclusions

Leonesio reviewed the record evidence in this case, including Plaintiff's medical records, post-incident statements made to the NYPD's Internal Affairs Bureau, and the deposition testimony. He analyzed this information based on his training as an EMT, police officer, and law enforcement trainer, as well as his knowledge of laws and court rulings as they relate to the core tasks of the law enforcement profession.

The Report concludes that Plaintiff's right orbital floor fracture was most likely caused by a prolonged beating and could not have been caused by the TASER prong that struck Plaintiff's eye.

In reaching this conclusion, Leonesio notes that based on the medical records, Plaintiff experienced a right orbital floor fracture with inferior displacement. Citing to a short article by the Cleveland Clinic, he notes that in this type of injury, the thickest part of the eye socket remains intact but a fracture forms in the thin bone at the lower part of the eye socket. Citing to an article published in the National Library of Medicine, Leonesio notes that such an injury requires a directed blunt force.

Based on a review of the case materials, Leonesio identifies three possible incidents of blunt force trauma to Plaintiff's head and face: (i) the closed-fist strikes that Officer Veloz directed at Plaintiff for about 15 seconds, per his deposition testimony; (ii) the impact from Officer Veloz's TASER prong striking Plaintiff in the eye; and (iii) the prolonged beating that Plaintiff alleges he received from the officers after he was handcuffed, which included strikes to his head. Leonesio concludes that of these three incidents, "the only reasonable explanation"

for the fracture are either Officer Veloz's delivery of closed-fist strikes for 15 seconds or the alleged prolonged beating by the officers. He opines that it is most likely that the prolonged beating caused the fracture, because "it is unclear whether less than 15 seconds of punches could cause the severe facial trauma displayed in the photographic evidence and described in the medical records."

Leonesio further opines that it is not possible that the orbital fracture could have been caused by the TASER probe strike because, in sum, a TASER does not deliver sufficient force to cause an orbital fracture. In reaching this conclusion, he notes that the type of TASER used by the officers, the TASER X26P, is a single-shot ESW that uses compressed gas to propel two 3.8-centimeter, 2.8-gram probes into the target at a rate of approximately 42 meters per second. The TASER produces 50,000 open-circuit volts and approximately 1440 volts (peak) into a typical 600-ohm load. It produces an average of 1.2 milliamps of pulsed current at a rate of 19 pulses per second, delivering a charge of 63 microcoulombs to the target when fired from an optimum range of 7 to 15 feet and a completed electrical circuit is established. Leonesio calculated the terminal ballistic performance of the probe and found that the probe delivers an average of 2.5 joules, or 1.8-foot pounds of force, which, Leonesio opines, is roughly the equivalent force of being struck with a hard-hit ping pong ball.

The Report states that further evidence for ruling out the TASER probe as the mechanism for Plaintiff's injury is that Officer Veloz was 10 feet away from Plaintiff at the time of the TASER firing. Although this distance is within the "optimum range," Leonesio opines that a drag is produced by the spooled electrical wire connecting the probe to the cartridge, and the probe thus loses velocity quickly, which has a "direct and dramatic" downward effect on the probe's kinetic energy as it travels downrange.

Leonesio searched "the medical literature relating to TASER injuries" and found that while soft tissue eye injuries secondary to TASER probe deployments can and do occur, the literature does not reveal any "reports of bone fractures resulting from TASER probe impacts." Additionally, he notes that the manufacturer of the TASER warns of the possibility of soft tissue injury but offers no warnings or risk advisements of bone fractures.

## LEGAL STANDARDS

The admissibility of expert testimony is governed principally by Rule 702 of the Federal Rules of Evidence, which provides in relevant part that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, the district court is "the ultimate gatekeeper" of expert testimony.  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

The threshold question under Rule 702 is whether the witness is qualified to provide expert testimony on the subject matter at hand.  *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005).  To make this determination, a court must "ascertain whether the proffered expert has the educational background or training in a relevant field."  *Cary Oil Co., Inc. v. MG Ref. & Mktg., Inc.*, 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003) (citation omitted.)  A witness may be qualified based on any one or more of the qualities listed in Rule 702—knowledge, skill, experience, training, or education.  *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp.

6

2d 457, 458 (S.D.N.Y. 2007) (citation omitted). The court then "compare[s] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

If the expert is qualified, the court must ascertain whether the testimony is reliable. *Nimely*, 414 F.3d at 396. "[R]eliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between" the expert's methodology and conclusions. *Id*. The analysis must be reliable "at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached," the opinion testimony must be excluded. *Id*. at 266.

Finally, if an expert is qualified and his or her testimony is reliable, the court must determine whether the testimony "will 'assist the trier of fact.'" *Nimely*, 414 F.3d at 397 (quoting Fed. R. Evid. 702). In order to assist the trier of fact, the testimony must be relevant, and it may not be directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help. *United States v. Mulder*, 273 F.3d 91, 104 (2d Cir. 2001).

**APPLICATION**

**1. Leonesio is Not Qualified to Opine on Causation of Plaintiff's Injuries**

Leonesio has expertise in the fields of use of force and, specifically, use of ESWs such as TASERs. His experience is highly practical and relates to the proper procedures, safety, and training for officers and other users of ESWs. Accordingly, he is qualified to testify on issues such as what an appropriate amount of force would be in a situation like the one at hand, whether the officers were properly trained in their use of ESWs, whether the TASERs were properly used on Plaintiff, and whether Plaintiff's injuries may have been avoided with different

training or a different approach. He also could competently testify as to general TASER safety, testing, design, and purpose, and generally what happens when a TASER is deployed. Plaintiff's characterization of Leonesio as a "police practices expert" implies that Leonesio's testimony concerns the realm of appropriate police practices and whether those practices were used.

However, Leonesio has not opined on those issues here. Instead, his testimony regards what caused Plaintiff's orbital fracture. He proffers two primary insights: first, that it is more likely that the fracture occurred from a prolonged beating rather than a brief one, and second, that a TASER could not have caused the fracture. Nothing in Leonesio's background, training, or experience qualifies him to testify on causation of an orbital fracture.

Leonesio's only medical training is as an EMT, and he last served in that role in 2001. He has no medical degree and no scientific background. He has no apparent education, training, or experience regarding bone fractures, the anatomy of the eye (or anatomy generally), the strength of the orbital bones (or any bones), or the force needed to cause an orbital fracture (or other injury). Leonesio's knowledge of orbital fractures is entirely drawn from two articles discussing orbital fractures. Given his lack of experience in the relevant area, Leonesio is simply not qualified to opine on the causation of orbital fractures. *See, e.g.*, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 189 (E.D.N.Y. 2001), *aff'd*, 303 F.3d 256 (2d Cir. 2002) (although industrial hygienist was qualified to testify to health risks associated with particular workplace chemicals, he lacked the expertise to hypothesize as to causation of plaintiff's injuries because he was not a doctor, toxicologist, neurologist, or biochemist); *Grajeda v. Vail Resorts Inc.*, 2023 WL 2613543, at *4-5 (D. Vt. Mar. 23, 2023) (although experienced ski patroller was qualified to testify on issues related to ski safety, he was "not a doctor" and thus was not qualified to testify to what caused Plaintiff's injuries).

Notably, one of the articles on which Leonesio relies stresses the complexity of orbital fractures "due to the complex anatomy of the bony and soft tissue structures involved," and notes the importance of "[k]nowledge of anatomy" in dealing with trauma to the orbit, including knowledge of the "frontal, ethmoidal, sphenoid, zygomatic, and lacrimal bones" that "form the bony structures of the orbit."[3]  There is no evidence that Leonesio has any knowledge of the complex anatomy at work here.  To qualify as an expert on the topic of injury to such a complex piece of anatomy, an individual would likely need specialized training in a relevant area such as ophthalmology, otolaryngology, or facial plastic surgery.  *See In re Fosamax Prod. Liab. Litig.*, 2009 WL 4042769, at *6-7 (S.D.N.Y. Nov. 23, 2009), *aff'd sub nom. Flemings v. Merck & Co.*, 399 F. App'x 672 (2d Cir. 2010) (doctor was not qualified to testify as an expert on diagnosis of bisphosphonate-associated osteonecrosis of the jaw because he was not specialized in that area).

The Report also relies on Leonesio's search of medical literature relating to TASER injuries, but there is no evidence that he is competent to analyze and interpret medical literature and apply the findings of medical experts to a specific case.  *Cf. United States v. Ray*, 2022 WL 101911, at *14 (S.D.N.Y. Jan. 11, 2022) (toxicologist was qualified to interpret medical literature because the field of toxicology is "developed from scientists and other experts who do not have a M.D. but who do have a Ph.D. interpreting medical records").

Leonesio opines that a TASER prong has roughly the equivalent force of a hard-hit ping pong ball.  The court would not rely on an experienced ping pong player to testify to whether a ping pong ball could cause an orbital fracture.  So too, Leonesio is not the proper person to

---

[3] Koenen L, Waseem M. NIH, Orbital Floor Fractures, Nat'l Lib'y of Medicine, Nat'l Ctr for Biotech. (August 7, 2022), https://www.ncbi.nlm.nih.gov/books/NBK534825/.

9

testify to whether a TASER or closed-fist strikes could do so, despite his experience and training in use of force and general ESW usage and safety.

Plaintiff's cases are not to the contrary. In those cases, the expert was testifying to an area in which he had significant practical experience. For example, in *Packard v. City of New York*, the court found that a former NYPD officer was qualified to opine on the relationship between lack of training and false arrests where the officer had "extensive experience training officers and observing whether such training impacts their conduct." 2020 WL 1479016, at *3 (S.D.N.Y. Mar. 25, 2020). Similarly, in *Valentin v. New York City*, a former NYPD officer was deemed qualified to testify as an expert on the issue of sexual harassment and gender discrimination against police officers where he had three sociology degrees, had written books and taught university courses on relevant issues, and had practical knowledge of behavioral and cultural norms of NYPD officers and institutions. 1997 WL 33323099, at *18 (E.D.N.Y. Sept. 9, 1997). Likewise, the expert in *Cerbelli v. City of New York* was deemed qualified to testify about the effects of NYPD practices on people in mental crises where he had "significant experience in assessing" police practices in that context. 2006 WL 2792755, at *11 (E.D.N.Y. Sept. 27, 2006).

By contrast, here, Leonesio opines on the causation of a specific type of facial injury. Nothing in his years of experience and training qualifies him to do this. Because Leonesio is not qualified to offer an opinion as to injury causation, which is the entire focus of his Report, the Report must be excluded under Rule 702.

### 2. Leonesio's Testimony is Not Reliable

Even if Leonesio were qualified to opine on the cause of Plaintiff's injury, his opinions do not rest on a reliable foundation and there is no meaningful analytical connection between his methodology and conclusions.

To start, Leonesio's opinions rest on his review of two medical articles discussing orbital fractures, but neither article discusses what amount of force is required to cause an orbital fracture or whether an orbital fracture is more likely to be caused over a prolonged period of blunt trauma rather than a short period. However, Leonesio extrapolates from these articles the notion that a certain amount and duration of force is needed to effectuate an orbital fracture, but at no point does he quantify that amount or duration of force needed. To the extent Leonesio extrapolates from these articles any information about the amount or duration of force necessary to cause a fracture, his conclusions are speculative. *See Amorgianos*, 137 F. Supp. 2d at 189; *Deutsch v. Novartis Pharm. Corp.*, 768 F. Supp. 2d 420, 426 (E.D.N.Y.2011) ("[W]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion" is relevant in evaluating the admissibility of the testimony).

Based on his assumption that some duration of force is needed to cause the orbital fracture, Leonesio concludes that "it is unclear whether less than 15 seconds of punches could cause" Plaintiff's injury and, therefore, it is more likely that the injury was caused by a prolonged beating. Leonesio has provided no explanation for how he reached this conclusion. Nothing in the Report suggests that an orbital fracture requires a prolonged rather than brief period of trauma except for Leonesio's say-so. To the contrary, the article Leonesio relies on states that the common mechanisms for such fractures are "falls, high-velocity ball-related sports, traffic accidents, and interpersonal violence." Koenen, *supra* n. 3. This suggests that a brief and isolated incident of trauma to the area, such as falling to the ground or being hit by a ball, is sufficient to cause a fracture.

As to Leonesio's conclusion that a TASER does not deliver sufficient force to cause an orbital fracture, Leonesio's methodology is flawed because, as discussed above, he never

11

calculates what force is sufficient to cause an orbital fracture.  He also never meaningfully calculates the amount of force with which Plaintiff was hit by the TASER, because he never quantifies the impact (if any) of the loss of velocity on the TASER prong, but simply states that the loss may be "dramatic."  He also does not quantify the relative amount of force from a closed-fist strike as compared to a TASER prong.  There is also no explanation for how Leonesio calculated the "terminal ballistic performance" of the TASER probe or the kinetic energy that is transferred via the probe.  Accordingly, the opinion regarding the inability of a TASER to cause an orbital fracture is not meaningfully based on any calculations or other methodology, and it amounts to mere conjecture.

Moreover, Leonesio's reliance on the purported lack of medical literature and warnings of potential fractures by the manufacturer are not reliable, because Leonesio does not state how he searched for or reviewed the literature or the extent to which TASER-related eye injuries are expected to appear in medical literature.  *See Grajeda*, 2023 WL 2613543, at *5 (reliance on lack of documented information as to the causation of an injury to a person from properly installed equipment did not amount to reliable methodology and was speculative).

The Report also fails to consider numerous potentially relevant factors.  For example, Leonesio does not discuss whether the fracture could have been caused by some combination of injuries inflicted to Plaintiff's face, or whether the other injuries to Plaintiff's eye, including the ruptured globe and detached retina, provide any clues as to orbital fracture.  In fact, the Report does not discuss the other eye injuries at all.  Additionally, although an article on which Leonesio relied states that a fall is a common cause of an orbital fracture, and Plaintiff alleges that he fell to the floor after being hit by the TASER prong, Leonesio does not consider

Plaintiff's fall as a possible cause of the fracture and does not explain why he ruled this out as a possible cause.

The fact that Leonesio's opinions are not reached through reliable methods provides an alternate ground for exclusion of his Report under Rule 702.

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendants' motion to preclude Plaintiff from relying on Leonesio's opinions. As there is no need for Defendants to submit a rebuttal report on this issue, the deadline for Defendants to do so is terminated. By **Monday, May 22, 2023**, the parties shall file a joint letter updating the Court on the status of discovery.

**SO ORDERED.**

DATED:   New York, New York
         May 12, 2023

_____
KATHARINE H. PARKER
United States Magistrate Judge